■ In the Matter of ADELINE PADILLA, Petitioner, v JOHN G. MARTINEZ, as Chairman of the New York City Housing Authority, et al., Respondents. [752 NYS2d 28] —In this proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of Supreme Court, New York County [Alan Saks, J.], entered March 27, 2002), determination of respondent Housing Authority, dated October 11, 2000, which terminated petitioner's tenancy on the ground of nondesirability, unanimously an-

nulled, without costs, the petition granted and the matter remanded for a new administrative hearing.

While this Court's power under article 78 to overturn an administrative agency's determination is limited, we are charged with the obligation to insure that the proceeding leading to such determination comported with basic tenets of due process (*see People v David W.*, 95 NY2d 130, 139-140) and complied with the agency's own guidelines and procedures (*see Matter of Conlon v McCoy*, 27 AD2d 280, 281). After a careful review of the record before us, we conclude that the determination in this case failed to meet these minimal standards and must be annulled.

Petitioner has resided in the Forest Houses public housing development in the Bronx since October 1992 and now lives there with three of her four children. The fourth child, who suffers from cerebral palsy and profound mental retardation and is confined to a wheelchair, lives in an institution but visits the family at home on weekends and holidays and in the summer.

On or about September 2, 1998, the Housing Authority served petitioner with a notice commencing termination of tenancy proceedings on the ground of nondesirability. The notice charged that, on October 28, 1997, petitioner "unlawfully physically and verbally assaulted another person, Marlene [Larrier], on or in the vicinity of Authority premises, to wit: [petitioner] did punch Marlene [Larrier] in her head causing a bump to right of forehead." The notice further charged that, in violation of rules and regulations, petitioner "failed to refrain from illegal or disorderly activity that impairs the project grounds," in that she committed this unlawful assault.

At a hearing commenced on August 29, 2000, Marlene Larrier testified that she was the assistant manager of Forest Houses and working in her office on October 28, 1997, when she heard petitioner shouting and using obscene language in the office of housing assistant Brenda Williams. Larrier went to Williams' office to see if she could help. Fearing for Williams' safety, she sent Williams out. Petitioner continued to shout and scream. As Larrier began to back out of the office, petitioner punched her in the face with a clenched fist. Larrier grabbed petitioner's hands and the two struggled until they were separated by two other employees. Larrier ran to her office and locked herself in. Petitioner followed Larrier down the hall and banged on her door, screaming that it was not over. She pulled a time clock off the wall, threw it through the glass panel on the door, and reached through the broken glass to

open the door. She entered Larrier's office and was grabbed by two employees who locked her in another room until the police arrived. Larrier was treated at Bronx Lebanon Hospital and released.

Larrier's secretary, Kathy Brown, confirmed Larrier's testimony that petitioner had been heard in Brenda Williams' office, yelling and sounding very upset. She also saw petitioner pull the time clock out of the wall and throw it through Larrier's door.

Petitioner, who was not represented by counsel, did not deny hitting Larrier or throwing the time clock through the glass panel in the door. Rather, she explained that she went to Williams' office to complain about several dispossess notices she had received and to tell Williams that, since her rent checks were sent directly from the Department of Social Services to the Housing Authority, someone from the Authority must be stealing them. In addition, she was being charged $25 for each notice. Petitioner testified that because she was very upset she hit Williams' desk, asking when this was going to stop. At this point, Larrier came into Williams' office, sent Williams out, and then slapped petitioner's face with an open hand. Petitioner became very angry and hit Larrier back "really hard." When Larrier ran to her office, petitioner followed and threw the time clock through the office door. She was arrested, pleaded guilty to disorderly conduct, and received a sentence of one year's probation, six weeks of community service and a fine of $80.

Following the testimony of these three witnesses, the Hearing Officer recommended termination of petitioner's tenancy on the ground of nondesirability, having found that petitioner punched Larrier and followed her down the hall with the intention of hurting her. However, the Hearing Officer also found facts that were not in evidence and her decision relied heavily on those unsupported findings. The decision emphasized that: "[o]n cross-examination Tenant did not deny that on several occasions she has physically attacked other tenants. She merely insisted, referring to some of the incidents, that the other person hit her first. To another question, she protested 'Why are you asking me that? You can't prove anything.'"

This is a mischaracterization of the testimony. Petitioner was cross-examined about one unexplored incident with another tenant, which she explained was long ago and provoked by the other tenant's attack on her. The Hearing Officer's reference to "several occasions" can only have come from a question counsel for the Housing Authority put to petitioner on cross-examination: "In fact, we get a lot of complaints about

you hitting other people. Do they all hit you first; how many people have hit you first?" The Hearing Officer appears to have improperly treated this question as evidence.

The Hearing Officer mischaracterized the testimony in two other respects. Her assertion that petitioner "protested" in response to counsel's question about other attacks misquotes petitioner's response, which was actually an attempt to protect herself against the unfounded claim. Petitioner challenged counsel to "[s]how me all the people that you said I hit them; show me. Show me, give me proof. You don't got no proof. Show me all the proof." Indeed, no proof was shown. The Hearing Officer also stated in her decision that petitioner "also acknowledged that when angry she reacts without restraint, 'like dogs,' " while petitioner's testimony actually was an expression of her opinion that, when provoked to anger, all human beings act like dogs.

Although the record evidence establishes no more than one isolated misdeed on petitioner's part, an altercation with a Housing Authority employee arising from circumstances that would be frustrating and distressing to any tenant, the Hearing Officer suggested in her decision that petitioner had engaged in a pattern of assaultive behavior and presented a danger generally. Thus, the Authority's determination to terminate petitioner's tenancy for nondesirability is based in part on unfounded conclusions.

Moreover, review of the hearing record leads inescapably to the conclusion that the Housing Authority took advantage of petitioner's inability to represent herself, asking improper questions and using improperly obtained testimony to arrive at a determination to evict her, in violation of its own policies designed to afford tenants who it suspects are mentally disabled "adequate procedural safeguards and reasonable accommodation of their mental disabilities" (*Blatch v Franco*, 1998 WL 265132, *1, 1998 US Dist LEXIS 7717, *4 [SD NY, May 26, 1998]).

The record reflects that petitioner engaged in inappropriate, unresponsive, disturbed and even bizarre behavior during the hearing. From the moment it began, until Larrier finished testifying, petitioner interrupted repeatedly, interjecting, "She's lying" or "You're lying," and crying and hissing uncontrollably. The Hearing Officer began by requesting the appearances. When counsel stated that Larrier would be a witness, petitioner remarked, "[S]he was not there. That lady was not there." When asked whether she had any objection to correcting the spelling of Larrier's name in the notice of the Hous-

ing Authority's charges, petitioner answered yes, because Larrier was lying. The Hearing Officer tried in vain to persuade petitioner to stay quiet until the Housing Authority's witnesses were finished, assuring her that she would have an opportunity to present her case, offering a glass of water, and exhorting petitioner to control herself. At the close of petitioner's testimony, when counsel said she had no further questions, petitioner volunteered, "Cause she know she's lying."

Further, respondent Housing Authority's counsel's cross-examination explicitly raised the issue of petitioner's psychiatric status, apparently on the basis of information to which counsel had access before the hearing commenced. Counsel began by asking, "Did you ever go to a psychiatrist about your—" Petitioner interrupted, "Yes." Counsel: "—temper?" The testimony continued as follows:

"[PETITIONER]: Yes. I got psychiatrist. I go to SSI's, and they say I got—I drink pills for my heart. I had two heart attack, you know.

"HEARING OFFICER: You get SSI?

"[PETITIONER]: Yes, ma'am.

"HEARING OFFICER: What do you get it for?

"[PETITIONER]: For mentally—I don't know how to read and write.

"[COUNSEL]: Isn't it because you can't control your temper?

"[PETITIONER]: No, ma'am, no, ma'am. Why you don't go and check the record? I give you the name of the doctor and everything. You see if they—it was not for that.

"HEARING OFFICER: Okay, do you see a psychiatrist or—

"[PETITIONER]: No, not no more, ma'am.

"HEARING OFFICER:—some other professional?

"[PETITIONER]: She died.

"HEARING OFFICER: Well, do you see anybody?.

"[PETITIONER]: No, not no more, ma'am."

The Hearing Officer then opined that petitioner had a problem controlling her temper, adding, "[I]f you were seeking help, and have been trying to do something, like take medication for it * * * that could make a difference." It is obvious that the Hearing Officer herself recognized that, at the least, petitioner had a serious problem. She asked petitioner whether any doctor had ever suggested that she take some kind of medication "to help you keep calm" and whether petitioner had ever taken anything like that to help keep herself calm. Petitioner said no to both questions. However, the Hearing

Officer did not bother to ask any follow-up questions after petitioner testified that she had been seeing a psychiatrist until the psychiatrist died and she made no reference in her decision to the belief she expressed at the hearing that petitioner needed professional help. The final sentence of her decision reads: "Nothing in the record whatsoever could serve to mitigate the requested disposition."

In any event, once again the Hearing Officer appears to have accepted as evidence the purported facts embedded in counsel's questions. Counsel asked whether petitioner had ever gone to an anger management psychotherapist, or a Dr. Horace Batser, or the Occupational Hygiene Center, to which petitioner answered no. The only evidence of the purpose of the psychiatric treatment petitioner received was her uncontroverted testimony that she was treated for something other than an inability to control her temper. Indeed, her explanation that she receives SSI for "mentally—I don't know how to read and write" suggests at least the possibility of some mental condition that the Social Security Administration recognized, even if petitioner herself was incapable of identifying it.

Despite petitioner's inappropriate and bizarre behavior during the hearing, the Housing Authority's apparent knowledge that petitioner had been treated by a psychiatrist, petitioner's testimony regarding her treatment by a psychiatrist, and the Hearing Officer's comments to the effect that petitioner needed psychiatric help, the Authority, in violation of its own policy (*see Blatch, supra*), held a hearing at which it used petitioner's inability to represent herself against her. When the Authority seeks to administratively terminate the tenancy of a tenant who it suspects may be mentally disabled, it must first refer the tenant to its Social Services Division for evaluation and then, if he or she is evaluated as possibly mentally incapacitated, refer him or her to the Protective Services for Adults (PSA) of the Human Resources Administration of the City of New York, following which the hearing will not commence until PSA indicates either that the tenant is not eligible for protective services or that arrangements have been made for the appointment of a guardian and/or representative for the tenant (1998 WL at *1-2, 1998 US Dist LEXIS at *4-5).

"The above procedures are designed to prevent a mentally incapacitated tenant from appearing at a termination proceeding unrepresented. If, however, during the course of a hearing, a tenant appears to be incapable of adequately defending his or her rights, and is unrepresented, the hearing officer should terminate the proceeding, adjourn the hearing, and refer the

matter to the Housing Authority's Operation Services Tenancy Administration Division ('OSTA') for a prompt evaluation of the tenant. OSTA then determines whether the tenant requires referral to PSA. The termination hearing is not to recommence until PSA determines either that the tenant is not eligible for protective services, or arrangements have been made for the appointment of a guardian or representative for the tenant" (1998 WL at *2, 1998 US Dist LEXIS at *6).

The Authority did none of this.

"The deferential standard of review accorded administrative determinations in article 78 proceedings presupposes administrative procedures that conform with due process requirements" (*People v David W.*, *supra*, 95 NY2d at 139-140 [citations omitted]). Here, it is clear from the record that petitioner was incapable of representing herself adequately and equally clear that she was prejudiced by the Housing Authority's exploitation of her incapacity. "[A]lthough a hearing may be conducted with a degree of informality, the essential due process elements of a trial must be observed" (*Matter of Biondolillo v Lang*, 57 AD2d 762, 762). The proceedings here were manifestly unfair and compel annulment of the resulting disposition (*see Matter of Sowa v Looney*, 23 NY2d 329, 335; *Matter of Holiday v Franco*, 268 AD2d 138, 141; *Biondolillo*, *supra* at 763). Concur—Nardelli, J.P., Saxe, Ellerin, Rubin and Friedman, JJ.